## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF FLORIDA
## PENSACOLA DIVISION

**HARRY A. LAIRD, IV,**

      **Plaintiff,**

    **v.**　　　　　　　　　　　　　　　**Case No. 3:15cv394-MCR-CJK**

**BOARD OF COUNTY COMMISSIONERS,**
**WALTON COUNTY FLORIDA, et al.,**

      **Defendants.**

_____/

## ORDER

Plaintiff Harry A. Laird, IV, brought this suit against his former employer, the Board of County Commissioners of Walton County, Florida, and two individuals, Larry Jones and Cindy Meadows, claiming that he was terminated in retaliation for exercising his First Amendment rights, 42 U.S.C. § 1983, and in violation of Florida's Public Employee Whistleblower Statute, Fla. Stat. § 112.3187, *et seq.* Each Defendant has filed a Motion for Summary Judgment. Having fully reviewed the matter, the Court finds that the motions are due to be granted, with the exception of the whistle-blower retaliation claim against the County.

## I.   Background[1]

Harry A. Laird, IV, was employed for ten years by the Walton County Board of County Commissioners (the "County"), most recently as Flood Plain Manager in the Department of Planning and Management.  The County Administrator, Larry Jones, terminated Laird's employment for insubordination on July 21, 2015.  The undisputed facts reflect the following.

Laird's employment with the County began in 2005.  He was a Planner in the Planning Department with responsibility for building permit review.[2]  From 2010 through 2012, he worked as a communications coordinator in the County Administration Department.  He became a certified floodplain administrator and began working as Flood Plain Manager in 2012.  As Flood Plain Manager, Laird was responsible for reviewing building permit applications to determine whether they complied with the County's Land Development Code ("LDC"), the County's Comprehensive Plan, and the flood plain requirements of the FEMA (Federal Emergency Management Act).  His duties as Flood Plain Manager included

---

[1] For the limited purposes of this summary judgment proceeding, the Court views "the evidence and all reasonable inferences drawn from it in the light most favorable to the nonmoving party," which in this case is the Plaintiff.  *Martin v. Brevard County Pub. Sch.*, 543 F.3d 1261, 1265 (11th Cir. 2008) (internal marks omitted).

[2] *See* ECF No. 55-32, at 14-15 (Dep. of Mac Carpenter, Planning Manager, at 13-14).  Mac Carpenter, Planning Manager, reported to Dyess and had been Laird's supervisor in the Planning Department when Laird was a Planner.

reviewing proposed building plans of projects impacting conditions related to floodplains, wetlands, coastal dunes, and coastal dune lakes, and determining whether the County's height, setback, and parking requirements were met.  He also reviewed files of subdivisions that were developed before the County's LDC was enacted for the purpose of determining whether they were in compliance with flood plain and coastal dune lake requirements.

Laird's immediate supervisor was Wayne Dyess, Planning Director.  Dyess reported to the County Administrator, Larry Jones, who was the head of all County departments.

## A.    The Decimal Point Memo

In January 2015, while reviewing files for purposes of identifying whether subdivisions were in compliance with coastal dune lake requirements, Laird came across a memo in a file related to the Blue Mountain subdivision.  The memo was drafted in 2008 by another Planner in the Department, Melissa Ward, and in the memo, Ward took responsibility for a "decimal point error," which she acknowledged had resulted in a billing error in 2005.  The memo explained that instead of billing the Blue Mountain subdivision the required recreational impact fee of $614,000, Ward had billed only $614, and she did not notice the error before recording the final plat.  Laird knew Ward and said she had been terminated in 2011

for improper permitting.[3]  Laird did not have personal knowledge of this incident and did not suspect Ward of wrongdoing.  Nonetheless, because of the large amount of the error reported in the 2008 memo, he wondered whether someone senior to Ward might have benefitted, and so he gave the memo to his supervisor, Dyess.[4] Dyess told Laird to put it in the file, and he would take care of it.  Dyess then asked the County Attorney Mark Davis to look into the matter and also forwarded the memo to the County's finance department.  The County contacted the State Attorney's Office, which began an investigation into the matter that concluded in September 2015.[5]

Laird testified that during the investigation, Mr. Jones and Mr. Davis held a department-wide meeting in which they encouraged employees to cooperate with

---

[3] The record reflects that Dyess (who did not work for the County in 2008) recommended the termination of Ward's employment in September 2011 on grounds that she had engaged in improper permitting procedures, stating that she "knowingly issued approvals without following proper protocol," citing the Board of County Commissioner's Policy 18.2 (insubordination, failure to perform in a satisfactory manner and incompetence or negligence).  ECF No. 55-10.

[4] Laird testified that a review of this type of fee ordinarily would be handled by the Planner and the Project Manager, and he would not typically be involved.  However, Laird's review of the file that day was pursuant to his duties, i.e., to determine whether the subdivision had been approved in error or whether the lots would be impacted by the LDC in a manner that would require an interpretation or review by his supervisor, Dyess.

[5] Ultimately, on September 4, 2015, a Grand Jury indicted a former Planning Director for perjury during the investigation process.  As to the memo itself, the Grand Jury found only that the loss of revenue was due to error and that the failure to collect this fee and another fee attributed to a similar error totaled almost $800,000.  The Grand Jury found that this was "egregious and unacceptable" and recommended that the Planning Department implement various levels of review and be permitted to purchase software to calculate and track fees accurately.

the investigation. ECF. No. 48-1, at 47 (Laird Dep. at 187-88). Several County employees, including Laird, were questioned by the State Attorney's Office in voluntary interviews.  Laird was questioned on two occasions, once in March 2015 and again in late-April or May 2015.  Laird never told anyone what he was asked in his interview with the State Attorney or what he had said, although it is clear from the record that he did not know anything about this incident aside from finding the memo in the file.  The County department heads were generally aware that he and others were being interviewed.  The investigation resulted in significant media coverage, which Laird said gave the County "a black eye" and was a source of embarrassment to the County, and "I'm the guy who found it" (meaning the memo). ECF No. 48-1, at 4 (Laird Dep. at 15).

### B.    Laird's Termination

Jones terminated Laird's employment on July 21, 2015, citing insubordination based on Laird's response to the County Administrator's request for a written explanation regarding an incident where Laird had approved a 15-foot setback in a permit without taking the matter to the Board of Adjusters for approval.  ECF No. 48-2, at 5-6.  The setback issue came to light on June 30, 2015, when Commissioner Cindy Meadows received an email from a constituent, Tony Cook, the Secretary of the Sugarwood Homeowners' Association ("Sugarwood HOA"), requesting a

meeting "as soon as possible" about "some unusual actions by Code enforcement and the Planning Department regarding construction in our development." ECF No. 48-3, at 13; ECF No. 55-23. On July 2, 2015, Meadows met with Cook and Dave Erickson, President of the Sugarwood HOA, and they expressed concern over a five-foot reduction to the setback requirement that one property owner in their development had received. This property owner was allowed a 15-foot setback requirement, instead of the 20-foot setback requirement that applied to the rest of the neighborhood, and the Sugarwood HOA representatives questioned why one lot owner did not have to comply with the same rules that applied to the rest of the development. Concerned that a permit had been erroneously or illegally issued in violation of the County's LDC, Commissioner Meadows asked County Administrator Jones and County Attorney Davis, who were in the area that day, to look into the matter.[6] None of them had seen a variance issued outside of a Board of Adjustment process and without notice to adjoining property owners.

After meeting with the Sugarwood HOA representatives, Jones and Davis also met with Laird to ask for an explanation. According to Laird, he explained to them

---

[6] Laird admits that there is a document showing that someone had made a complaint about the setback. Laird said Stephanie Manning from Code Enforcement had spoken to him about the complaint, although it is unclear from the record when that occurred. According to Laird, he had explained to her that Chapter 8 of the LDC authorized a hardship exception in this circumstance.

that he made the determination to approve the setback in the same manner he has done throughout his time as Flood Plain Manager, stating that his supervisor Dyess allowed him to make hardship exceptions pursuant to Chapter 8 of the Land Development Code, which provides an exception from the variance process. Jones also asked Laird to provide a written explanation, which Laird does not dispute, and Laird provided one two weeks later by email. However, according to Laird, he also spoke with County Attorney Davis a few days later on July 8, and Davis indicated that nothing else was needed; consequently, Laird thought the matter was settled. But when Jones did not receive a written explanation and two weeks had passed, Jones mentioned it to Dyess (Laird's supervisor), and Dyess told Laird he should provide a written explanation to Jones. Laird sent Jones the brief written explanation by email on July 16, 2015.

Jones was unhappy with the delay and with Laird's explanation, which Jones felt was inadequate. He signed a termination notice on July 21, 2015, stating that Laird had violated County Policy 18.2 by engaging in conduct that was "disruptive, insubordinate, antagonistic, offensive or injurious to the County;" for failing to perform his job in a satisfactory manner; and for "[i]ncompetence, inefficiency, negligence, or failure to follow orders," as detailed in an attachment. ECF No. 46-2. Attached to the form was a statement by Jones describing the incident involving

the Sugarwood HOA complaint and setback that Laird had approved, along with Jones's statement that Laird had failed to provide a timely and adequate written explanation when directed to do so.  According to Jones, this amounted to "failure to perform job duties and insubordination."  ECF No. 46-2, at 2.  By deposition, Jones explained that he made the decision to terminate Laird because his act of bypassing the Board of Adjustment proceeding was unusual, because Laird failed to provide an adequate reason for granting the setback and none appeared in the file, and also, because Laird failed to timely provide a written explanation when directed to do so, and Jones thought Laird's email response was insufficient.  Jones also said that Dyess reported that Laird "didn't think it was a big deal." Also in his deposition, Jones referenced incidents of other complaints the County had received about Laird, but these were not included in the termination notice.[7]

Laird's employee evaluations from 2013 and 2014 show that his job performance met or exceeded expectations, and the only official discipline in his personnel file was a 2009 written warning he received for participating in an office

---

[7] For instance, Jones mentioned an incident when Laird had told a constituent they were "screwed," and the person had written to complain; an incident when Jones learned from constituents of an issue regarding an RV in which Laird may have given advice contrary to the Code; and another incident of a house permitted with a second floor that extended into setbacks and the owners had to request a variance.  Jones testified that these incidents reflected a pattern of disregard, contrary to the County's best interests.

sports pool during work hours, for which he received a "formal counseling."  ECF No. 55-9.   Laird testified that he was surprised at being terminated over the Sugarwood setback incident because he felt that he had authority under Chapter 8 of the LDC and from Dyess to grant a hardship exception in certain instances.[8] Dyess testified that he had encouraged the Planning Department employees to use their professional judgment to interpret the Code themselves when dealing with permits.[9] Although Dyess suggested he might have been more lenient than Jones, he signed the termination notice as Laird's direct supervisor and acknowledged it was Jones's decision and that Jones had the authority to terminate Laird.

According to Laird, Commissioner Meadows was behind the termination decision.[10]  He testified that Stephanie Manning, who worked in Code Enforcement at the time, told him that Meadows had sent another Code Enforcement officer, Anna Reichart, to "spy" on Laird in late 2014, searching for a reason to have him fired.

---

[8] The County Attorney Davis testified that this setback incident is when he learned that "variances were being granted by staff," and he issued an opinion that hardship exceptions also must proceed through the Board of Adjustment process, like variances.

[9] A former employee, Jonathan Bilby, had worked as Flood Plain Manager in the Planning Department with Dyess before Laird took the position.  Bilby testified that that the Walton County LDC includes provisions that allow staff to grant setback reductions as a hardship exception in certain instances without going through the formal variance procedure.  Bilby said he had done this from time to time while Dyess was supervisor and was never disciplined or fired for doing so.

[10] Notably, Laird testified that he did not know of any connection between his finding the "decimal point memo" and Meadows.

Manning offered hearsay testimony that Reichart told her Laird and Dyess "were on their way out the door. They were going to be fired." ECF No. 55-4, at 55. Manning believed that Meadows sent Reichart to "spy" on them. According to Laird, another County Commissioner, Celia Jones, told him that she was sorry about his termination and said Mr. Jones wished he wouldn't have done it, except that he knew Meadows wanted Laird terminated, so he took the opportunity to do so with the setback issue. Commissioner Jones (no relation to the County Administrator, Mr. Jones) confirmed this in her own testimony, saying she had spoken with Mr. Jones about the termination because she felt that his evaluation of Laird was harsh.[11]  She testified that Mr. Jones told her Meadows "had been wanting to get rid of Hal [Laird] for a long time. I remember that exactly." ECF No. 55-7, at 6 (Celia Jones Dep. at 5). She testified, however, that the termination decision was made by Mr. Jones, not Meadows.

Commissioner Meadows stated that she did not have the authority to hire or fire employees other than her own assistant, and she denied having any part in the decision terminate Laird. Meadows said she also did not urge Jones to fire Laird.

---

[11] She expressed the opinion that, "if you terminate someone, you need to make sure that you don't, you know, that it's not so harsh that they can't get a job somewhere else and I did tell Larry that I remember." ECF No. 55-7.

She said that she knew of Laird only because the County had received several complaints about him. In addition to the Sugarwood HOA setback incident, the record includes two emails sent to Meadows by constituents in July 2014, reporting delays they experienced in waiting for permits and that Laird displayed a negative attitude and used disrespectful language (telling one constituent she was "screwed" due to a Code change). Additionally, there was a telephone complaint about Laird from another constituent, Patricia Helms, in June 2015, which was discussed in interoffice emails.

### C.    Additional Incidents

In his Complaint, Laird states that after he discovered the "decimal point memo" and participated in the State Attorney's investigation, Jones and Meadows "openly questioned his professional judgment." To support this allegation, he testified that he applied for a transfer from Flood Plain Manager to Beach Maintenance Manager and did not receive an interview, although he did not know when the position was filled or how many people applied, and he only assumed that the person awarded the position was less qualified than he. He testified to an instance in May 2015 when an RV was improperly parked on a lot by a temporary power pole, and, instead of asking the Planning Department whether they had issued a permit, Meadows posted it on Facebook and asked generally if anyone knew

anything about it.  Laird took this as a personal insult and said he was then questioned about it by his supervisor.  None of the statements by Meadows or the comments by citizens reference Laird.  When asked what connection this had to his termination, Laird candidly answered, "I don't see any."

One other example Laird offered to show that his judgment was questioned related to an email entitled, "Counseling," that he received from his supervisor, Dyess, on June 30, 2015.  The brief email from Dyess memorialized an incident that had occurred the previous day; the email provided no details except to say that "it is highly inappropriate to contact a customer to inquiry why they called a Commissioner."  He urged Laird not to let it happen again.  According to Meadows and emails by her assistant, on June 29, 2015, a constituent, Mrs. Helms, had called to complain about Laird, saying he was rude and "irate" with her for lodging a complaint about him with the Commissioner.  Laird does not dispute that the incident occurred but disputes Meadows's characterization of it.  He responded to the "Counseling" email by offering a written explanation, stating, while he had called Mrs. Helms back to explain the reason for the delay of her inspection, he was not rude or irate but had "merely helped [her] acknowledge the fact that calling in a complaint about someone who is not at fault in any way has repercussions."  ECF

No. 55-22.  In his verified declaration, Laird said that he did not scold Mrs. Helms for calling the Commissioner's office.

### D.      Grand Jury Proceedings

A Grand Jury convened in June 2015.  After Laird's termination on July 21, 2015, he was called to testify before the Grand Jury, either in late July or mid-August, although he had received the subpoena before his termination.  The Grand Jury's sealed report was issued on September 4, 2015, the same day Laird filed this suit.[12]  The Grand Jury indicted Patsy Blackshear (who had been Melissa Ward's supervisor) with two counts of perjury for lying during the investigation and to the Grand Jury.  The Grand Jury also issued a report, which was unsealed on September 24, 2015.  In the report, the Grand Jury addressed various other internal matters and offered recommendations for changes that needed to be made in administration; in organizing, following the chain of command, and management of the Planning Department; and in the LDC and the auditing process.  The report also included concerns about the roles of Mr. Jones and Commissioner Meadows, who were criticized for being directly involved in day to day county operations, including their

---

[12] Laird received the subpoena before his termination but did not actually testify before the Grand Jury until after his employment had been terminated.  The Grand Jury report issued on September 4, 2015.

Case No.: 3:15cv394-MCR-CJK

involvement in the hiring and firing of Planning Department employees and allowing direct supervisors little input.  The report states that the Grand Jury heard testimony that Meadows was involved in a code enforcement issue in which normal procedures were not followed and that Meadows and Jones terminated a Planning Department employee with little or no input from the department director and without following the County's progressive disciplinary procedures: "Evidence indicates that Commissioner Meadows wanted this employee  terminated and that Larry Jones directly ordered the termination." ECF No. 55-26. The report recommended Jones and Meadows be reprimanded for not following chain of command and department policies.  Laird felt that he was the employee referenced who was terminated without the proper progressive disciplinary procedures as described in the report. [13]

## II.     Discussion

### A.     Summary Judgment Standard

Summary judgment is appropriate when "the pleadings, depositions, answers to interrogatories and admissions on file, together with the affidavits, if any, show that there is no genuine dispute as to any material fact and that the moving party is

---

[13] Testimony by Jones confirmed that Laird is the only person that Jones directly terminated.

Case No.: 3:15cv394-MCR-CJK

entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "The moving party bears the initial burden of informing the court of the basis for its motion and of identifying those materials that demonstrate the absence of a genuine issue of material fact." *Rice-Lamar v. City of Ft. Lauderdale*, 232 F.3d 836, 840 (11th Cir. 2000) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986)). In response, the nonmoving party must "go beyond the pleadings" and identify competent record evidence showing the existence of a genuine, material factual dispute for trial. *Celotex Corp.*, 477 U.S. at 324. An issue of fact is material if, under the governing substantive law, it might affect the outcome of the case. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). In considering a motion for summary judgment, the Court views the evidence, and all factual inferences reasonably drawn from the evidence in the light most favorable to the nonmoving party, *see Hairston v. Gainesville Sun Publ'g Co.*. 9 F.3d 913, 918 (11th Cir. 1993), and credibility determinations are impermissible, *see Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 150-51 (2000). Where reasonable minds could differ regarding inferences to be drawn from undisputed facts, summary judgment will be denied. *See Miranda v. B & B Case Grocery Store, Inc.*, 975 F.2d 1518, 1534 (11th Cir. 1992) (citing *Mercantile Bank & Trust Co. v. Fidelity & Deposit Co.*, 750 F.2d 838, 841 (11th Cir. 1985)). Ultimately, the question is "whether the evidence presents a

sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Ziegler v. Martin Cty. Sch. Dist.*, 831 F.3d 1309, 1318 (11th Cir. 2016) (quoting *Anderson*, 477 U.S. at 251-52).

## B.     First Amendment Retaliation Claims

"Speech by citizens on matters of public concern lies at the heart of the First Amendment . . . ." *Lane v. Franks*, 134 S. Ct. 2369, 2377 (2014).  It is beyond dispute that, although public employees accept certain limitations on their freedoms, they retain a clearly established right to speak as citizens on matters of public concern.  *See, e.g., id.*; *Garcetti v. Ceballos*, 547 U.S. 410, 420 (2006); *Connick v. Myers*, 461 U.S. 138, 151 (1983); *Pickering v. Bd. of Educ.*, 391 U.S. 563, 568 (1968).  It is also beyond dispute that a public employer may not retaliate against public employees for speech that is protected by the First Amendment.  *See Rankin v. McPherson*, 483 U.S. 378, 383 (1984); *see also Alves v. Board of Regents of the Univ. Sys. of Ga.*, 804 F.3d 1149, 1159 (11th Cir. 2015).   However, the First Amendment does not permit public employees "to 'constitutionalize the employee grievance,'" *Garcetti,* 547 U.S. at 420 (quoting *Connick*, 461 U.S. at 154); moreover, speech that "owes its existence" to the public employee's professional responsibilities is not constitutionally protected, *id.* at 421; *Moss v. City of Pembroke Pines*, 782 F.3d 613, 618 (11th Cir. 2015).

To strike the proper balance between a public employee's First Amendment interests in free speech and the public employer's legitimate interests in efficiently discharging governmental functions, courts conduct a four-factor analysis and ask: (1) whether the employee engaged in speech as a citizen on a matter of public concern, and (2) whether the employee's First Amendment interests outweigh the public employer's efficiency interests; if so, (3) whether the speech was a "substantial motivating factor" in the termination decision, and (4) whether the employer can show that it would have terminated the employee even without the protected speech. *See Moss*, 782 F.3d at 617-18. Through the first two factors, the Court determines whether the employee's speech is constitutionally protected. *See id.* at 618. The final two inquiries, which "address the causal link" between protected speech and the termination decision, are questions of fact, "unless the evidence is undisputed."[14] *Id.*

Laird claims he was terminated for disclosing the decimal point memo and interviewing with the State Attorney's Office. The County asserts that disclosure of the memo was within the ordinary course of Laird's job duties because he was

---

[14] In the ordinary First Amendment retaliation context, where speech by a public employee is not involved, a plaintiff must prove (1) that his "speech was constitutionally protected; (2) that he "suffered adverse conduct that would likely deter a person of ordinary firmness from engaging in such speech;" and (3) that a "causal relationship" existed "between the adverse conduct and the protected speech." *Castle v. Appalachian Tech. Coll.*, 631 F.3d 1194, 1197 (11th Cir. 2011).

reviewing the file for LDC compliance, and therefore, his speech disclosing the contents of the file to his supervisor, is not protected.  The Supreme Court stated in *Garcetti* and further explained in *Lane* that, "when public employees make statements pursuant to their official duties," they are not speaking as citizens, and the First Amendment does not insulate their communications from discipline.  *Lane*, 134 S. Ct. at 2378; *see also Garcetti*, 547 U.S. at 421 (finding the views expressed by a public employee were not protected because they were expressed in a memo that was part of his ordinary job duties).  "The critical question under *Garcetti* is whether the speech at issue is itself ordinarily within the scope of an employee's duties, not whether it merely concerns those duties."  *Lane*, 134 S. Ct. at 2379 (finding that truthful testimony given under oath by a public employee, which was *outside* the scope of his ordinary job duties, was speech as a citizen, even though "the testimony relates to his public employment or concerns information learned during that employment").

Laird did not draft the memo or express any opinion on its contents.  He found it in a file he was reviewing for compliance issues, indisputably within the ordinary course of his job duties, and immediately disclosed it to his supervisor.  Laird's job duties included reviewing this existing subdivision file for compliance issues and obtaining his supervisor's interpretation.  Laird argues that the scope of his duties

did not include investigating potential fraud or reviewing recreational impact fees to determine whether the fees had been properly billed or paid.   Nonetheless, his compliance review told him that something his department was responsible for was amiss, and it was something his supervisor should see.  *Garcetti* instructs that the inquiry into whether a public employee is speaking as a citizen "is a practical one." 547 U.S. at 424 (noting that the employee's actual job duties are more indicative of the nature of speech than a job description alone); *see also Moss*, 782 F.3d at 618 (noting that factors such as the job description, where the speech occurred, and whether the speech concerned the employee's job are relevant but that no one factor is dispositive).  Because Laird's disclosure of the error and potential wrongdoing to his supervisor was made in accordance with his ordinary duties of searching for and reporting compliance issues to his supervisor, and he followed the chain of command by immediately notifying Dyess, the disclosure is properly considered employee speech.  *See Wagner v. Lee Cty.*, No. 16-10576, 2017 WL 456430, at *11 (11th Cir. Feb. 2, 2017) (unpublished)[15] (finding that speech—voluntarily disclosing potentially illegal conduct of co-employees to an auditor—by an employee of the

---

[15] While unpublished opinions are not considered binding, they may be considered as persuasive authority.  *See* 11th Cir. R. 36-2; *see also United States v. Futrell*, 209 F.3d 1286, 1289 (11th Cir. 2000).

Economic Development Office, who regularly performed secretarial tasks, was part of her job and not protected); *see also Phillips v. City of Dawsonville,* 499 F.3d 1239, 1242-43 (11th Cir. 2007) (finding no protected speech where a city clerk disclosed misconduct by the mayor; although the clerk's enumerated duties did not include reporting misconduct of the mayor, it was within her official duties to inquire about potentially inappropriate use of city resources).  The undisputed record shows that "the main thrust" or reason for Laird's disclosure of the memo to Dyess, *Alves*, 804 F.3d at 1166, was that he felt it important to disclose the memo to his supervisor because it showed a noncompliance issue regarding the subdivision he was reviewing, and the error involved a large amount of public money.[16]  In doing so, he engaged in speech with his supervisor within his ordinary duties as a public employee, not citizen speech.

Moreover, Laird's conduct of submitting to voluntary interviews with the State Attorney's office during the investigation cannot be construed as protected speech.  There is no indication in the record of what Laird was asked or what he said or communicated; there is nothing in the record to show that he knew anything other

---

[16] The Grand Jury report later criticized the Planning Department for not always following the chain of command and not implementing appropriate supervisory review (which led to this decimal point error going undiscovered for ten years), and thus, Laird's conduct is in full accordance with how the Grand Jury recommended the Department should function.

than what the decimal point memo said (which the County had already disclosed to the State Attorney); and there is certainly no indication that Jones or Meadows knew what Laird said in the interviews, even if they knew he attended them.  His conduct of *attending* voluntary interviews, which the County encouraged him to do, is not itself protected speech.

However, even assuming that Laird's disclosure of the decimal point memo could be considered speech by a citizen on a matter of public concern,[17] and that, under the second inquiry of *Moss*, 782 F.3d at 617-18, there is no County interest in efficiency that would outweigh the speech, then the question would turn on the causal link.  The Court finds alternatively that the claim fails at this third inquiry because the record is devoid of any causal link between Laird's speech and his termination.  Laird relies on temporal proximity to establish causation, and to do so, he points to his interviews with the State Attorney.  Close temporal proximity between protected conduct and an adverse employment action ordinarily can supply

---

[17] There is no dispute that the subject of the memo was a matter of public concern, as it showed a mistake that impacted public funds, implicated potential mismanagement by the County, and suggested the possibility of malfeasance by a County employee.  *See Bryson v. Waycross*, 888 F.2d 1562, 1566 (11th Cir. 1989) ("[A] core concern of the [F]irst [A]mendment is the protection of the 'whistle-blower' attempting to expose government corruption.").  However, "the relevant inquiry is not whether the public would be *interested* in the topic of the speech at issue, it is whether the *purpose* of the employee's speech was to raise issues of public concern" as a citizen.  *Alves*, 804 F.3d at 1167 (internal quotation and alteration omitted).

sufficient circumstantial evidence to create a genuine issue of material fact as to the necessary causal link. *See Brungart v. BellSouth Tele., Inc.*, 231 F.3d 791, 799 (11th Cir. 2000). "But mere temporal proximity, without more, must be 'very close.'" *Thomas v. Cooper Lighting, Inc*., 506 F.3d 1361, 1364 (11th Cir. 2007) (quoting *Clark Cty. Sch. Dist. v. Breeden*, 532 U.S. 268, 273 (2001)). Here, as the County argues, seven months passed between the disclosure of the decimal point memo and Laird's termination, and the Court finds this span of time too great to raise an inference of retaliation. *See id.* at 1364 (noting a three to four month difference is not enough to raise an inference of retaliation). Also, it is clear on the record that the County itself disclosed the memo to the investigatory authorities in January 2015. Laird's assertion that his interview with the State Attorney supplies the necessary temporal proximity for the First Amendment claim fails because the Court has found that the conduct of *attending* the interview is not protected speech.

Laird also relies on a handful of incidents that he asserts show that Jones and Meadows questioned his judgment after his disclosure of the memo, suggesting that this shows a retaliatory motive. Again, the Court disagrees. The record does not support this argument. Every additional incident Laird mentioned as showing that his judgment had been questioned is wholly unconnected to the disclosure of the memo and occurred either in 2014, before he disclosed the memo, or late in June

2015, nearly six months after the protected conduct (*assuming* disclosure of the memo was protected).  Also, the record shows that all but the RV incident were instigated by citizen complaints, as documented in emails, not manufactured by Jones or Meadows.

The RV incident involved Meadows posting a question on Facebook, "What's up with the RV on the side of the road on 395?"  This occurred in May 2015, which is still four months after Laird's disclosure of the memo—too long to raise a connection between this incident and the disclosure of the memo.  Moreover, it reflects no retaliatory intent.  Neither Meadows's comments nor any of the citizen comments on the post reference Laird, and he was not reprimanded for any conduct related to the incident.  Laird testified only that his supervisor questioned him about it.

The record reflects that Jones made the termination decision based on Laird's failure to respond promptly and adequately about the setback when directed to do so in July 2015.  Jones and Laird's supervisor Dyess signed the termination notice. Laird does not deny that the incident occurred.  Whether termination was the correct or fair response in light of Laird's explanation or whether his supervisor was consulted in the decision is not at issue.  *See Alvarez v. Royal Atlantic Developers, Inc.*, 610 F.3d 1253, 1266 (11th Cir. 2010) (noting courts "do not sit as super-

personnel department[s]").  Whether Jones thought Meadows wanted Laird fired is also not at issue because nothing in the record suggests that Meadows wanted Laird fired *due to his protected speech* in January 2015.  Assuming Laird's testimony and evidence as true, Meadows had wanted him fired since 2014 when she sent a "spy" from Code Enforcement, Anna Reichart, to watch for violations.  When Laird was asked during his deposition what Meadows did to retaliate against his speech, he answered that he did not know.  Laird also conceded that he knew of no connection between his conduct of disclosing the decimal point memo and Meadows, and he knew of no reason she would be irritated because he found it. There is simply no basis in the record to "constitutionalize" Laird's grievances over these additional incidents.[18]  *See Garcetti,* 547 U.S. at 420. Laird has shown no evidence that his termination was based on or substantially motivated by protected speech, and thus, even assuming his speech was protected, the analysis fails at the third factor.  *See Carter v. City of Melbourne, Fla.*, 731 F.3d 1161, 1170 (11th Cir. 2013) (finding

---

[18] Again, the question is not whether Laird was a good employee, whether he had a good reason for the setback exception, or whether Jones's termination decision was fair or mistaken. Nor is the question whether Meadows had a reason to want Laird terminated, in the absence of any evidence that she wanted him terminated due to speech.  The Court "does not sit as a super-personnel department" and it is not the Court's role "to second-guess wisdom of an employer's business decisions . . . as long as those decisions were not made with a [retaliatory] motive." *Alvarez v. Royal Atlantic Developers, Inc.*, 610 F.3d 1253, 1266 (11th Cir. 2010) (internal quotations omitted).  The sole question boils down to whether Laird was terminated for protected speech, which there is no evidence of.

that the third prong of the free speech analysis was not met where the employee could not show "that the disciplinary and personnel decisions against him were motivated by his speech activities, rather than the misconduct with which he was charged").[19]

### C.      Florida Public Employee's Whistle-blower's Act

Laird also raises a public employee whistle-blower's retaliation claim against the County.  Fla. Stat. § 112.3187, *et seq.* ("Whistle-blower's Act").  In relevant part, the Whistle-blower's Act protects public employees "who disclose information on their own initiative in a written and signed complaint," or "who are requested to participate in an investigation."  Fla. Stat. § 112.3187(7).  Retaliation claims under the Whistle-blower's Act require proof (1) that the employee engaged in statutorily protected activity; (2) that the employee suffered an adverse employment action; and (3) that a causal connection exists between the protected activity and the averse action.  *See Wagner*, 2017 WL 456430, at *7.  Public employee whistle-blower claims are analyzed under the familiar burden-shifting framework applicable in Title VII cases.  *See id.* (citing *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 801-805 (1973)); *see also Rustowicz v. N. Broward Hosp. Dist.*, 174 So. 3d 414, 419 (Fla.

---

[19] Because Laird's First Amendment claim fails, the Court finds it is unnecessary to reach the qualified immunity issue.

Case No.: 3:15cv394-MCR-CJK

4th DCA 2015).  Thus, Laird must first establish by a preponderance of the evidence that he engaged in protected activity, at which point the burden shifts to the County to produce evidence of a legitimate, nondiscriminatory reason for the adverse employment action.  If the County does so, Laird has the opportunity to demonstrate a question of fact as to pretext, that is, to show that the proffered reason was merely a pretext for retaliation.  *See Rustowicz*, 174 So. 3d at 419-20.  Also, the Act is remedial, "and should be liberally construed in favor of granting access to protection from retaliatory actions." *Igwe v. City of Miami*, 208 So. 3d 150, 155 (Fla. 3d Dist. App. 2016) (citing *Irven v. Dep't of Health & Rehabilitative Servs.*, 790 So. 2d 403, 406 (Fla. 2001) (stating that "[section 112.3187(2)] could not have been more broadly worded")).

The County argues that Laird did not engage in protected activity because the "disclosure" consisted of him giving the "decimal point memo," drafted by Ward, to Laird's supervisor, Dyess, which does not satisfy the Act's disclosure requirements. To show he engaged in the protected activity of disclosure, Laird must have disclosed (1) protected information, (2) to a protected recipient, (3) in a protected manner.  *Wagner*, 2017 WL 456430, at *7 (citing Fla. Stat. § 112.3187(5)-(7)).  A jury could find that Laird disclosed protected information because the memo involved a suspected violation of law, gross mismanagement, or malfeasance.

However, the County argues that Laird did not make the disclosure to a protected recipient because his supervisor, Dyess, was the Planning Director and not a chief executive officer or an "other appropriate local official" under the statute.  Fla. Stat. § 112.3187(6); *see also Stanton v. Fla. Dep't of Health*, 129 So. 3d 1083, 1084 (Fla. 1st DCA 2013) (noting "disclosure" to supervisor was not sufficient without showing the supervisor "possessed the necessary authority to investigate").  The Court agrees.  Although Florida courts construe the term "other appropriate local official" broadly to include government entities empowered "to investigate complaints and make reports or recommend corrective action," *Wagner,* 2017 WL 456430, at *7 (citing *Rustowicz*, 174 So.3d at 423-25 (including an internal audit department)), Dyess was head of the Planning Department, which was not an investigative office.  Also, Laird did not make a written and signed complaint, as required under Fla. Stat. § 112.3187(7) (protecting employees who disclose information in a written and signed complaint).  Thus, Laird's act of finding the decimal point memo, drafted by Ward, and giving it to Dyess, is not a disclosure of protected information, to a protected recipient, in a protected manner under the Act.

Nevertheless, protected conduct under the statute also includes situations where employees "are requested to participate in an investigation" about any act or suspected act of gross mismanagement or malfeasance.  Fla. Stat. § 112.3187(7).

Laird is correct that the County does not address this prong of the statute.  The record, viewed in favor of Laird, shows that he was twice interviewed at the request of the State Attorney during the investigation about the decimal point error memo.  Laird voluntarily participated in the investigation.  Thus, a jury could find that Laird engaged in conduct protected by the Act.  Also, there is no dispute that Laird suffered an adverse employment action.

The County offered a legitimate nonretaliatory reason for Laird's termination.  Laird, in turn, has offered evidence that that his termination was a pretext for retaliation, relying on the temporal proximity between his protected activity and the termination.  To establish a causal connection, a plaintiff must show that the protected activity and the adverse action "are not completely unrelated." *Rice-Lamar v. City of Fort Lauderdale*, 853 So. 2d 1125, 1133 (Fla. 4th DCA 2003) (quoting *Olmsted v. Taco Bell Corp.,* 141 F.3d 1457, 1460 (11th Cir. 1998)).  Also, "the plaintiff must generally show that the decision maker was aware of the protected conduct at the time of the adverse employment action." *Goldsmith v. Bagby Elevator Co., Inc*., 513 F.3d 1261, 1278 (11th Cir. 2008); *see also Wagner*, 2017 WL 456430, at *9.  The County argues that Laird cannot raise an inference of retaliation or pretext because the memo was disclosed in January 2015, and Laird was not terminated until over seven months later, on July 21, 2015.  But the County overlooks the interviews.

For purposes of the Whistle-blower's Act, Laird's interviews with the State Attorney are considered protected conduct, and the second interview occurred as late as May 2015, which was only approximately two months prior to Laird's termination. This close proximity is sufficient to create a genuine dispute of material fact, unless there is unrebutted evidence that the decision-maker was unaware of the protected activity. The record is not unrebutted on this issue. There is evidence that Jones was aware of the investigation generally, that Jones and Dyess spoke about it, and that Jones encouraged County employees to cooperate in the investigation. While a jury could find that this, together with the legitimate reason offered for termination, in fact, proves that Jones did *not* have a retaliatory motive, a jury could draw a contrary inference from Jones's knowledge of the State Attorney's interviews, the proximity of the termination decision to the State Attorney's interviews of Laird, and possible inconsistencies, such as the lack of supervisor input or progressive discipline for an employee with solid performance evaluations. Construing the Whistle-blower's Act broadly, and construing every inference in the record in Laird's favor, the Court finds that he has raised material questions of fact that preclude entry of summary judgment on this claim.

Accordingly:

1.      The Board of County Commissioners of Walton County, Florida's

Motion for Summary Judgment, ECF No. 45, is **DENIED** as to the Public Employee

Whistle-blower Claim (Count I) and **GRANTED** as to the First Amendment

Retaliation Claim (Count III).

2.      Larry Jones's Motion for Summary Judgment, ECF No. 54, is

**GRANTED.**

3.      Cindy Meadows's Motion for Summary Judgment, ECF No. 48, is

**GRANTED**.

4.      Trial on Count I will be scheduled by separate Order.

**DONE AND ORDERED** this 26th day of March, 2017.


*M. Casey Rodgers*
_____

**M. CASEY RODGERS**
**CHIEF UNITED STATES DISTRICT JUDGE**


Case No.: 3:15cv394-MCR-CJK